# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information Associated with
DANIEL.GARCIA086@gmail.com

)
)
)
)
)
)

Case No. 17 - 850 m (N)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 1001, 1546, 1341, 1343, 371, 1589 and 1592

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached affidavit.

_____
*Applicant's signature*

Brooks Abramson, Special Agent

_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: April 14, 2017

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

The Honorable Nancy Joseph
_____, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Brooks Abramson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of application for a search warrant for information associated with a certain account that is stored at premises controlled by Google, Incorporated ("Google") an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountainview, California 94043. The account to be searched is DANIEL.GARCIA086@gmail.com (hereinafter, **"Subject Account"**) and is further described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the United States ("U.S.") Department of Labor, Office of Inspector General ("DOL-OIG") and have been so employed since 2013.

3.      As part of my duties as a DOL-OIG Special Agent, I investigate criminal violations related to the organized crime affecting the American workforce and programs overseen by the DOL, among them fraud in the foreign guest worker visa programs. Prior to my current position, I served for approximately four years in federal law enforcement and criminal intelligence capacities for the U.S. Departments of Homeland

Security ("DHS") and State ("DOS"), where I investigated, among other things, U.S. visa fraud crimes. I have received training at the U.S. Customs and Border Protection Law Enforcement Academy and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. As a Special Agent, I have participated in the execution of multiple federal search warrants.

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Witness interviews and conversations referenced in this affidavit are in summary form and are not verbatim translations of those interviews. Dates and figures used are approximations.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that in the account, described in Part II of Attachment A, in the possession of Google, there exists evidence of violations of Title 18, United States Code, Sections 1001 (false statements), 1546 (fraud and misuse of visas, permits, and other documents), 1341 (mail fraud), 1343 (wire fraud), 371 (conspiracy), 1589 (forced labor) and 1592 (document servitude).

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a),

2

(b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.      Since late October of 2016, DOL-OIG and the FBI Milwaukee Human Trafficking Task Force have been investigating G&S and C&D, companies that purport to recruit temporary foreign agricultural workers, primarily from Mexico, for use by various farms throughout Georgia. As described in detail below, the investigation has revealed that G&S, C&D and others have defrauded the immigration system by submitting numerous false applications for nonimmigrant visas. In particular, G&S, C&D, and others have engaged in a scheme to submit visa applications claiming that prospective employees would come to the U.S. to work in the State of Georgia when, in fact, dozens to hundreds of these workers were sent to farms in the County of Racine, and elsewhere, in the Eastern District of Wisconsin.

8.      The investigation has further revealed that through this scheme, G&S, C&D and others have engaged in the forced labor and document servitude of intended foreign-national visa beneficiaries. More specifically, witness statements and document review reflect that prior to beginning the term of any employment with G&S or C&D, these businesses required foreign-national employees to hand over their foreign passports containing the U.S. visas in order to prevent workers from early departure from their labor obligations. Witness statements and records gathered by investigators have revealed that G&S and C&D were family-run operations whose operators, Daniel GARCIA among them, regularly conducted business communications via e-mail,

3

including via the **Subject Account**. As is further described below, law enforcement believes that the **Subject Account** described in this Affidavit is an e-mail account used by Daniel GARCIA to conduct business on behalf of G&S and C&D, and evidence and instrumentalities of this scheme are likely located in the **Subject Account**.

**A.    Background on G&S and C&D**

9.    According to commercial and State of Georgia databases, G&S is a Georgia Domestic Corporation in good standing as of 2016. Georgia Secretary of State public records list a Saul GARCIA as CEO, a Saul GARCIA as CFO and Consuelo GARCIA as Secretary with a business address at the 108 Tallokas Trail, Moultrie, Georgia. During 2016, consular records show that G&S sponsored approximately 66 foreign nationals for agricultural work in the U.S.

10.    According to commercial and State of Georgia databases, C&D is a Georgia Domestic Corporation in good standing as of 2016. Georgia Secretary of State public records list Daniel GARCIA as CEO, CFO and Registered Agent and Consuelo GARCIA as Secretary with a business address at the 108 Tallokas Trail, Moultrie, Georgia. According to filings with the DOL your affiant has reviewed, C&D has been in operation since in or around 2013. During 2016, consular records show that C&D sponsored approximately 314 foreign nationals for agricultural work in the U.S.

**B.    Overview of the H-2A Temporary Agricultural Nonimmigrant Visa Program**

11.    From consular and immigration training, your affiant knows that foreign nationals cannot work for pay in the U.S. without prior authorization from the U.S. government.

12.    Foreign nationals may obtain work authorization in the U.S. through a nonimmigrant visa petitioned for on their behalf by a qualifying sponsoring U.S.-based employer.[1] A nonimmigrant visa allows a foreign national to enter the U.S. temporarily, to fulfill a specific purpose.[2]

13.    One means by which foreign nationals can obtain authorization to work for pay in the U.S. is by obtaining an H-2A nonimmigrant visa through a U.S.-based agricultural employer.[3] The H-2A visa allows a foreign national to work in the U.S. for a maximum uninterrupted period of three years.[4]

14.    To apply for the H-2A visa, the prospective U.S.-based employer must submit information to the DOL, DHS / U.S. Citizenship and Immigration Services ("USCIS"), and, in most cases, DOS.

15.    First, the prospective employer or its agent must file a DOL Form 970 Job Order ("Job Order") with the State Workforce Agency in the area of intended employment.  The Job Order lists the work hours and location where the intended H-2A workers will be employed.  This Job Order causes the State Workforce Agency to begin

---

[1]    There are limited exceptions to this general procedure, not applicable here.
[2]    8 U.S.C. § 1101(a)(15).
[3]    8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[4]    8 C.F.R. § 214.2(viii)(b).

5

attempts to recruit U.S. workers (i.e. U.S. Citizens or Lawful Permanent Residents) for the vacant agricultural jobs purported by the employer.[5] The employer themselves must also typically attempt their own recruitment efforts by posting newspaper advertisements for U.S. workers in a newspaper in the area of intended employment.[6] These steps are performed to adequately test the local job market for domestic labor.

16. Once the Job Order has been placed, and recruitment efforts for U.S. workers exhausted, the employer can submit a DOL Form 9142 Application for Temporary Employment Certification ("ATEC") to the DOL either by mail or internet submission. Whether mailed or remitted via internet, the ATEC is received at the DOL's Francis Perkins Building, 200 Constitution Avenue Northwest, Washington, D.C. The ATEC lists, among other things, steps taken to recruit U.S. workers, proffered wages to the intending H-2A workers and specific work locations, including worksite addresses. The DOL cannot certify (i.e. approve) the ATEC until the prospective employer has demonstrated that there are not sufficient able, willing and qualified U.S. workers and that U.S. wages will not be adversely affected by the intending H-2A beneficiaries. If submitted electronically, the ATEC does not require an original signature at the time of submission. Before the certified ATEC can be forwarded onto the DHS for final approval, however, it must be signed by both the U.S.-based employer and their agent/preparer (if applicable) under penalties of perjury.

---

[5]    20 C.F.R. § 655.121.
[6]    20 C.F.R. § 655.151.

17. Once the ATEC is certified, the U.S.-based employer submits a DHS Form I-129 Petition for a Nonimmigrant Worker ("petition") to USCIS for final adjudication. The petition must be sent, via mail, to one of two USCIS service centers through the U.S. The Petition lists, among other things, the wage levels and specific work locations where the intending H-2A's will be placed. The petition must also be signed by both the U.S.-based employer and their agent/preparer under penalties of perjury.

18. Upon receiving USCIS approval, the U.S.-based employer will be notified that their intending H-2A beneficiaries can present themselves in person to the nearest U.S. Embassy or Consulate for a visa interview by DOS officials. Although the foreign national does not have to sign the ATEC or Petition under penalties of perjury, they are required to provide a fingerprint certifying their visas are true and correct under penalties of perjury at the time of the visa interview abroad.

19. Once approved, an H-2A visa is affixed to the foreign national's passport, which the individual can present to U.S. Customs and Border Protection officials at any U.S. port of entry to apply for admission as an H-2A.

**C. Background of Investigation**

20. Since late October of 2016, law enforcement has been reviewing and investigating circumstances regarding the use of G&S workers by Borzynski Farms and its affiliated entities ("Borzynski" herein) within the Racine, Wisconsin area.

21. In or around August of 2016, The State of Wisconsin's State Workforce Agency, Wisconsin Department of Workforce Development ("WDWD"), assisted by migrant worker advocates, visited the Riverside Inn ("Riverside") of Racine, Wisconsin

7

based on a tip that hundreds of foreign national migrant workers were staying at Riverside and working at local farms, among them Borzynski. WDWD inspectors encountered Saul GARCIA, JR. ("GARCIA, JR."), who purported to be in charge of the G&S crews. WDWD requested and GARCIA, JR. provided a list of all G&S workers by name as well as the migrant labor contracts for each worker.

22. WDWD also learned, during a phone call with Consuelo GARCIA, that Saul GARCIA, SR. signed migrant labor contracts, Daniel GARCIA did the paperwork for the company and Consuelo "Connie" GARCIA was the point of contact for any further inquiries. WDWD Inspectors also learned that G&S was located and did business at 108 Tallokas Trail, Moultrie, Georgia. Of additional note to inspectors during these initial visits was that G&S was paying for all rooms at the Riverside and the GARCIAs had arranged for a food truck for the workers themselves. As a result, housing, transportation, communication and food supplies were all controlled by G&S, which your affiant notes from training, experience and consultation are indicators of labor trafficking.

23. During a follow-up encounter around September 2016, advocates attempted to make contact with migrant workers at the Riverside to offer food assistance vouchers to G&S workers. While attempting to speak with the G&S workers, GARCIA, JR. attempted to obstruct access to his workers by not allowing direct access or being in close proximity while advocates attempted to address G&S workers. GARCIA, JR. appeared most intrusive when advocates asked about G&S workers' pay to verify

8

eligibility for food voucher assistance. Due to these concerns, federal law enforcement was notified.

24.    On or about October 24 and 25 of 2016, law enforcement began surveillance of the Riverside. Of note were four yellow school buses used to transport dozens of migrant workers to Borzynski sites beginning at 6 a.m. daily and returning to the Riverside around 6 p.m. These busses bore State of Georgia license plates DWF 320, DWF 354, DWF 363 and DWF 364. Law enforcement database checks reveal that these buses are registered to G&S at 108 Tallokas Trail, Moultrie, Georgia 31788. Law enforcement also observed multiple vehicles following and leading the school busses to Borzynski sites. Among these accompanying vehicles was a black 2016 Chevrolet Silverado K250 bearing State of Georgia license plate QBP 1752. Law enforcement database checks reveal that this vehicle is registered to GARCIA, JR. at the 108 Tallokas Trail, Moultrie, Georgia.

25.    On November 7, 2016, your affiant learned from WDWD investigators that a G&S H-2A employee phoned WDWD seeking work. The G&S worker provided the name of J.R. to WDWD investigators, a name which was not on the list provided by GARCIA, JR. to WDWD (*See* ¶20). J.R. stated to WDWD investigators that he/she met with a WDWD investigator around August or September of 2016 when they were at the Riverside. J.R. was residing with the other G&S workers at the Riverside at that time. WDWD notified law enforcement, who began vetting the list of G&S workers provided by GARCIA, JR. to WDWD. Investigators were unable to locate any consular, immigration or work authorization for many of the purported G&S employee names. Based on training and experience and previous investigations into the H-2A program in

9

Wisconsin, I am aware of schemes which involve out-of-state H-2A labor contractors (such as G&S and C&D) providing labor in Wisconsin in violation of the geographic restrictions attested to on the ATEC and petition as described at Affidavit ¶¶15, 16. In order to obfuscate the fact that H-2A's are present in Wisconsin from outside of their required geographic work location, organizations involved in such schemes often provide their contracted H-2A workers with fraudulent names, dates of birth and Social Security Numbers and compensate the H-2A's under the fraudulent identifiers.

26. Between late evening on November 8, 2016 and early morning on November 9, 2016, three of the four G&S busses departed Racine, Wisconsin to a location unknown to law enforcement. This development, plus the fact that the harvest season was ending, led law enforcement to plan for an encounter with the last remaining G&S workers.

27. During the afternoon of November 10, 2016, FBI Milwaukee Human Trafficking Task Force and DOL-OIG, aided by local counterparts, performed a traffic stop of the last remaining G&S school bus in Mount Pleasant, Wisconsin after it departed a Borzynski property based on reasonable suspicion that visa fraud and labor trafficking was taking place.

28. During the traffic stop, agents encountered 23 workers on the bus, which was driven by an unlicensed worker among the group. Agents learned that the only female on the bus, who identified herself as Fernanda Casillas ("Casillas"), was the crew

10

leader. Casillas related to your affiant that every worker on the bus worked for Borzynski and was undocumented.[7]

29.     When asked to identify themselves, other passengers on the bus provided agents with what appeared to be fraudulent DHS I-551 U.S. Permanent Resident Cards ("resident card"). Despite presenting resident cards, many passengers told agents that they were present in the U.S. on H-2A agricultural worker visas. Your affiant knows from training and experience that someone with a legitimate resident card already has work authorization and does not need any visa to work.

30.     Upon being fingerprinted on scene for proper identification, most of the workers' identities came back to U.S. H-2A visa issuances overseas, and the identities on the H-2A visas did not match the identities on the apparently fraudulent resident cards in the workers' possession.

31.     After being properly identified, several workers provided voluntary statements to law enforcement during the evening of November 10, 2016.[8]

32.     Generally, dozens of workers related that they entered the U.S. on their H-2A visas to work in the Moultrie, Georgia area for C&D[9], a company run by GARCIA,

---

[7]     Interviews took place in the Spanish language, your affiant and other officers on scene being proficient in spoken and written Spanish.

[8]     On-scene fingerprinting on November 10, 2016 did not reveal any criminal history for the workers interviewed, and many workers made statements against their penal and financial interests. Law enforcement has independently corroborated portions of the workers' statements. No promises or benefits of any kind have been offered to workers in exchange for their cooperation and information in this matter. Each workers' role in this scheme continues to be investigated by law enforcement.

[9]     Prior to this encounter, law enforcement was unaware of C&D's connection to the GARCIA's. On-scene consular checks revealed that C&D Harvesting had multiple H-2A petitions for 2016 and sponsored hundreds of H-2A workers for purported agriculture work in the State of Georgia. This is when it was confirmed that C&D and G&S shared the same business address, 108 Tallokas Trail, Moultrie, GA.

11

SR. and managed by GARCIA, JR. Many of the workers possessed a white employee identification card bearing the letters C&D ("employee cards"). These employee cards contained the workers' true names (unlike the fraudulent resident cards). These work cards were used to punch in and out while the workers were on farms in Georgia, and it wasn't until it was time to come to Wisconsin that one of the GARCIAs provided workers with the fraudulent resident cards, which the GARCIA's indicated should be used to cash employee paychecks. Recall that an H-2A visa regulations prescribe geographical limitations to each workers' area of intended employment. Upon being given these fraudulent resident cards in preparation for coming to Wisconsin around July of 2016, many of the workers were asked to hand over their true Mexican Passports containing their H-2A visas. GARCIA, JR., assisted by Daniel GARCIA, was in charge of the C&D work crew in Wisconsin, and had departed Wisconsin two days prior to return to Georgia.

33.     During the evening of November 10, 2016, and due to the referenced fraud and trafficking factors discovered during initial interviews, law enforcement escorted the workers back to the Riverside and made arrangements for different lodging for the 23 workers.

34.     During the process of moving the workers out of the Riverside, your affiant was approached by the crew leader, Fernanda Casillas (*See* ¶27). Fernanda Casillas provided law enforcement with her resident card and an accompanying Social Security Card, and stated these items were given to her by her nephew, GARCIA, JR. to cash her paychecks. Fernanda Casillas then admitted that her true identity was Maria Remedios

12

GARCIA-OLALDE ("GARCIA-OLALDE"), and she was here on an H-2A visa sponsored by C&D. GARCIA-OLALDE voluntarily provided her fraudulent identity documents to law enforcement. GARCIA-OLALDE also provided law enforcement consent to search her phone, which had approximately 20 missed calls from GARCIA, SR. and GARCIA, JR. beginning shortly after the traffic stop.

35.    Between November 11, 2016 and present, your affiant interviewed workers E.O. and I.O. who related the following:

    a.    I.O. and E.O had both been to a house which was they believed to be owned by GARCIA, SR. on a street called "Tallokas" in Moultrie, Georgia to pick up employment paperwork. There, they met with a lady they knew as "La Patrona" Spanish for "the boss lady". There they also saw Daniel GARCIA, who they believed to be La Patrona's son.

36.    On November 11, 2016, your affiant contacted Consuelo GARCIA via telephone to request she accept service of a subpoena for records. Consuelo GARCIA relating the following:

    a.    Consuelo GARCIA's ex-husband is GARCIA, SR. and he is the owner of G&S. Her son, GARCIA, Jr. helps GARCIA, SR. with G&S business operations. C&D and G&S are basically the same company. Consuelo GARCIA's other son, Daniel GARCIA, runs C&D. Neither of the companies have an office, and operate out of the 108 Tallokas Trail, Moultrie, Georgia, Consuelo GARCIA's home. Consuelo GARCIA has an office in the home, where she prepares payroll and other documentation for both G&S and C&D. Consuelo GARCIA also related that she receives corporate mail for both G&S and C&D at the 108 Tallokas Trail, Moultrie, Georgia.

37.    In reviewing consular records, your affiant notes that the workers encountered in Racine, Wisconsin entered the United States on two separate petitions authorizing a total issuance of 272 H-2A visas. Both the ATEC's and the petitions list a

13

business address at the 108 Tallokas Trail, Moultrie, Georgia and are executed, under penalties of perjury, by Daniel GARCIA, listed as the "Owner" of C&D.

38.     On November 17, 2016, the Honorable Thomas Q. Langstaff, United States Magistrate Judge for the Middle District of Georgia issued a search warrant for the business office of C&D and G&S at 108 Tallokas Trail, Moultrie, Georgia, 31788, for evidence and instrumentalities concerning fraud offenses, in violation of Title 18, United States Code, Sections 1001 (false statements), 1546 (fraud and misuse of visas, permits, and other documents), 1341 (mail fraud), 1343 (wire fraud), 371 (conspiracy), 1589 (forced labor) and 1592 (document servitude).

39.     Among the evidence recovered at 108 Tallokas Trail, Moultrie, Georgia were check stubs containing the true identity of approximately 90 individuals along with money wire transfer receipts in the fraudulent names corresponding to each individual. This corroborated the fact that dozens of H-2A workers employed by C&D and G&S were present in the State of Wisconsin in 2016.

40.     Additionally, investigators have reviewed hundreds of money wire transfer transactions from Wisconsin money remittance locations known to have been used by C&D and G&S workers. Because the workers often remitted money in their own true names to their family members in Mexico, investigators were able to identify that C&D and G&S had Georgia H-2A workers in Wisconsin during the 2015 farming season as well.

41.     Because the C&D and G&S workers resided at the Riverside, investigators interviewed the hotel manager, B.L., about his/her interactions with the GARCIA's.

14

He/she related that, among other family members, Daniel GARCIA was present in Wisconsin in both 2015 and 2016 with multiple workers. Daniel GARCIA had to relinquish operational control of the Wisconsin crews to his brother, Saul GARCIA, JR. in 2015. B.L.'s statements are corroborated by the fact that Daniel GARCIA both signed for various worker rooms and used his Georgia driver's license in securing those rooms at the Riverside.

42. Investigators have also reviewed records received from both the GARCIA companies and Borzynski via federal grand jury subpoena. Your affiant notes dozens of e-mails, remitted to and from the **Subject Account**, show discussions between Daniel GARCIA and various members of Borzynski discussing, among other things, billing, payment, lodging and transportation in both Georgia and Wisconsin.

43. Your affiant notes a particular e-mail provided by C&D/G&S through subpoena production dated July 11, 2016 during the time C&D/G&S workers were first arriving in Wisconsin. In this e-mail, Borzynski employee T.B. sends Daniel GARCIA, via the **Subject Account**, an e-mail with an image of what appears to be a United States H-2A visa, stating that one of the workers left it on the bus from Georgia to Wisconsin. Although this e-mail was produced by C&D/G&S, it was not produced by Borzynski.

44. In addition to the aforementioned-e-mail referencing visas, Daniel GARCIA also sent to Borzynski, via the **Subject Account**, an e-mail dated August 19, 2016 containing a number of DHS notifications stating that H-2A visa holders had absconded from employment with C&D or G&S. Although this e-mail was produced by Borzynski, it was not produced by C&D/G&S.

15

45. A request to preserve data letter was generated on or about December 3, 2016 and March 2, 2017 and submitted to Google to initiate the preservation of data for e-mail address of **DANIEL.GARCIA086@gmail.com.** In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google's servers for a certain period of time.

46. For all of the foregoing reasons, case agents are requesting a search warrant for emails containing the information set forth in Attachment B for **the Subject Account** for the time period of January 1, 2013 to the present.

## BACKGROUND CONCERNING EMAIL

47. In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name google.com like the email account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the account's user or users.

48. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

49. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address

17

information can help to identify which computers or other devices were used to access the email account.

50.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States. [10]

---

[10] It is possible that Google stores some portion of the information sought outside of the United States. In *Microsoft Corp. v. United States*, 829 F.3d 197 (2d Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—

18

52.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the

---

including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Google. The government also seeks the disclosure of the physical location or locations where the information is stored.
In the Eastern District of Wisconsin, in case 17-MJ-1234 and 17-MJ-1235, 2017 U.D. Dist. LEXIS 24591 (Feb. 21, 2017), U.S. Magistrate Judge William E. Duffin rejected the Second Circuit's decisions in *Microsoft* and issued warrants that required Google and Yahoo! to disclose "all data responsive to the warrant regardless of whether that data may be stored on servers in or outside the United States."

19

geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

53.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with

DANIEL.GARCIA086@gmail.com that is stored at premises owned, maintained,

controlled, or operated by Google, a company headquartered at 1600 Amphitheatre

Parkway, Mountainview, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be disclosed by Google (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) December 3, 2016, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1001, 1546, 1341, 1343, 371, 1589 and 1592, those violations involving Daniel Garcia, Saul Garcia Sr., Saul Garcia Jr., and others and occurring after January 1, 2013, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Any and all employee or personnel records for individuals employed by Garcia & Sons Harvesting, Inc., C&D Harvesting, Inc., or their subsidiaries or affiliated companies (collectively referred to as "subject entities" herein), including but not limited to: contracts, correspondence, employment applications, emergency or family contact information, wage or salary information, labor contracts, employment offers, copies of airline tickets or itineraries, copies of government identification documents, passports, copies of visas or immigration documents, related filings and related approvals, tax and Social Security forms, and memorandums or documents showing discipline, complaints, termination, promotion or performance;

b. Any and all payroll information, including but not limited to: tax documents, timesheets, pay stubs, accounting and bookkeeping documents, paychecks;

c. Any and all financial records relating to subject entities, and their officers and employees, including but not limited to any and all labor contracts, subcontracts,

3

work orders, payment ledgers, payment receipts or memorandums documenting cash, wire, check, direct deposit, or any other form of payment;

d. Any and all copies of checks and actual wire transfer instructions, wire receipts, and/or bank account records showing the wiring or transfer of money or currency from copies of checks and/or actual wire transfer instructions, wire receipts, and/or bank account records showing the wiring or transfer of money via check or wire to or from subject entities;

e. Information regarding the manufacture of counterfeit, altered, or fabricated contracts, letters, business related forms, e-mails, and any immigration related documents;

f. Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

g. Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

h. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4